PAUL J. MANEY,
*Petitioner,*

*v.*

BOARD OF PAROLE AND
POST-PRISON SUPERVISION,
*Respondent.*

Board of Parole and Post-Prison Supervision
A151943

355 P3d 146

Zachary Lovett Mazer, Deputy Public Defender, argued the cause for petitioner. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Jeff J. Payne, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

HADLOCK, J.

## HADLOCK, J.

In 1980, one of the sentences that could be imposed on individuals convicted of aggravated murder was life imprisonment "to be served without the possibility of parole for 20 years." *Severy/Wilson v. Board of Parole*, 349 Or 461, 468, 245 P3d 119 (2010); *see* ORS 163.105(2) (1979) (describing sentence). When at least 15 years have passed after imposition of such a sentence on a person convicted of aggravated murder, that person—now an inmate—may petition the Board of Parole and Post-Prison Supervision for a "murder review hearing," at which the inmate has the burden of proving by a preponderance of evidence that he or she "is likely to be rehabilitated within a reasonable period of time." ORS 163.105(3) (1979) (describing murder review process available to a prisoner upon petition); *see Lopez v. Mills*, 249 Or App 674, 676 n 3, 278 P3d 94, *rev den*, 352 Or 665 (2012) (explaining the term "murder review hearing"). If the inmate meets that burden, the board will enter an order changing the terms of the inmate's confinement to "life imprisonment with the possibility of parole, or work release." ORS 163.105(4) (1979). This case presents the question of whether the Due Process Clause of the Fourteenth Amendment to the United States Constitution requires the board to grant an inmate's request for a psychological evaluation in conjunction with a murder review hearing. For the reasons set forth below, we conclude that it does not. Because petitioner's contrary argument forms the primary basis for his challenge to the board order at issue, we affirm.[1]

The background facts are mostly procedural and undisputed. Petitioner was arrested for theft in late 1979 after a store security guard accused him of shoplifting. In early 1980, petitioner returned to the store, waited outside until the guard left the store at the end of the work day, and then fatally shot the guard with a rifle. Petitioner was convicted of aggravated murder and sentenced to life imprisonment with a minimum term of incarceration of 20 years without possibility of parole, pursuant to ORS

---

[1] We reject petitioner's remaining argument, in which he contends that the board's order is not supported by substantial evidence, without written discussion.

163.105(2) (1979).[2] The trial court ordered that sentence to run consecutively to sentences that petitioner already had on recent robbery and burglary convictions. Starting in the late 1990s, the board periodically held murder review hearings to determine whether petitioner was "likely to be rehabilitated within a reasonable period of time." The board received an independent psychological evaluation of petitioner in conjunction with a 1997 murder review hearing; after that hearing, the board found that petitioner was not likely to be rehabilitated within a reasonable period of time. The board made a similar finding in 2002. The board held another murder review hearing in 2007 at which it received into evidence "a packet of materials related to [petitioner's] crime, psychological evaluations, court documents, and records of

---

[2] ORS 163.105 (1979) provides, in pertinent part:

"Notwithstanding the provisions of ORS chapter 144, ORS 421.165 and 421.450 to 421.490:

"* * * * *

"(2) When a defendant is convicted of murder defined as aggravated murder pursuant to subsection (2) of ORS 163.095, the court shall order that the defendant shall be confined for a minimum of 20 years without possibility of parole, release on work release, temporary leave or employment at a forest or work camp.

"(3) At * * * any time after 15 years from the date of imposition of a minimum period of confinement pursuant to subsection (2) of this section, the State Board of Parole, upon the petition of a prisoner so confined, shall hold a hearing to determine if the prisoner is likely to be rehabilitated within a reasonable period of time. The sole issue shall be whether or not the prisoner is likely to be rehabilitated within a reasonable period of time. The proceeding shall be conducted in the manner prescribed for a contested case hearing under ORS 183.310 to 183.500 except that:

"(a) The prisoner shall have the burden of proving by a preponderance of the evidence that he is likely to be rehabilitated within a reasonable period of time; and

"(b) The prisoner shall have the right, if he is without sufficient funds to employ an attorney, to be represented by legal counsel, appointed by the board, at state expense.

"(4) If, upon hearing all the evidence, the board finds that the prisoner is capable of rehabilitation and that the terms of his confinement should be changed to life imprisonment with the possibility of parole, or work release, it shall enter an order to that effect. Otherwise, the board shall deny the relief sought in the petition.

"(5) Not less than two years after the denial of the relief sought in a petition under this section, the petitioner may petition again for a change in the terms of his confinement. Further petitions for a change may be filed at intervals of not less than two years thereafter."

the Department of Corrections." In addition, petitioner submitted 13 exhibits, including evidence of his participation in prison programs, his plan for release, and letters of recommendation. In the final order that issued after that hearing, the board observed that petitioner had asked the board to pay for a new psychological evaluation. The board rejected that request. Petitioner petitioned for judicial review; we affirmed the board's order without opinion, and the Supreme Court denied review. *Maney v. Board of Parole*, 258 Or App 534, 311 P3d 527 (2013), *rev den*, 354 Or 814 (2014).

Another murder review hearing was scheduled for November 2010. The hearing notice issued by the board informed petitioner that the hearing would be conducted in the manner prescribed by ORS 163.105 or ORS 163.115, and pursuant to the administrative rules found in OAR chapter 255, division 32. The notice also set out a nonexclusive list of criteria, as described in OAR 255-032-0020, that could indicate whether an inmate is likely to be rehabilitated. The notice informed petitioner that the board would appoint and pay for an attorney if petitioner wanted one but could not afford to pay. Regarding the presentation of evidence, the notice specified that discovery was not permitted and that it was petitioner's responsibility to provide the board with any information that he wanted it to consider at the hearing, although the board might subpoena witnesses on his behalf upon a proper showing.

Before the hearing, petitioner asked that the board "order a psychological evaluation of [petitioner]" to give him an "opportunity to demonstrate that his mental state has improved." In response, the board first observed that no law required it to "create evidence on the request of the petitioner." The board also declined to exercise its discretion to order a psychological evaluation and, therefore, denied petitioner's request.

The record before the board at the 2010 hearing included the judgment, pre-sentence investigation, and other materials associated with petitioner's aggravated murder conviction; psychological evaluations from 1981 and 1997; and copies of other board orders and Department of Corrections (DOC) materials related to petitioner's incarceration and

previous murder review hearings. Petitioner, who was represented by counsel, submitted a hearing memorandum supported by several exhibits, including letters of support and thanks from prison employees, volunteers, and visitors; DOC documents reflecting petitioner's compliant behavior and prison activities; positive "inmate performance reports"; and petitioner's written parole plan. In addition, petitioner called several witnesses at the 2010 murder review hearing, including a person who had worked "essentially as a correctional treatment therapist" for about eight years and who testified favorably to petitioner, describing what he viewed as petitioner's sincere efforts in prison programs designed to help deter juveniles from criminal behavior.

The board took the matter under advisement after the November 2010 hearing and subsequently issued an order in which it unanimously found, after applying the OAR 255-032-0020 factors,[3] that petitioner had "not satisfied his

---

[3] OAR 255-032-0020 provides:

"The sole issue of the hearing described in OAR 255-032-0015 shall be to determine whether or not the inmate is likely to be rehabilitated within a reasonable period of time. Criteria indicating whether the inmate is likely to be rehabilitated prior to release include:

"(1) The inmate's involvement in correctional treatment, medical care, educational, vocational or other training in the institution which will substantially enhance his/her capacity to lead a law-abiding life when released;

"(2) The inmate's institutional employment history;

"(3) The inmate's institutional disciplinary conduct;

"(4) The inmate's maturity, stability, demonstrated responsibility, and any apparent development in the inmate personality which may promote or hinder conformity to law;

"(5) The inmate's past use of narcotics or other dangerous drugs, or past habitual and excessive use of alcoholic liquor;

"(6) The inmate's prior criminal history, including the nature and circumstances of previous offenses;

"(7) The inmate's conduct during any previous period of probation or parole;

"(8) The inmate does/does not have a mental or emotional disturbance, deficiency, condition or disorder predisposing them to the commission of a crime to a degree rendering them a danger to the health and safety of the community;

"(9) The adequacy of the inmate's parole plan including community support from family, friends, treatment providers, and others in the community; type of residence, neighborhood or community in which the inmate plans to live;

"(10) There is a reasonable probability that the inmate will remain in the community without violating the law, and there is substantial likelihood that the inmate will conform to the conditions of parole."

burden of proof under ORS 165.105(2)" and that petitioner "is not likely to be rehabilitated within a reasonable period of time." The board acknowledged petitioner's "positive employment and disciplinary history" while incarcerated. However, it determined that "other factors demonstrate that [petitioner] is not likely to be rehabilitated within a reasonable period of time," including that petitioner "significantly minimized his actions in murdering [the security guard], particularly in denying the planned nature of the crime." The board also acknowledged that petitioner had participated in some prison programs, but determined that he had "not demonstrated a desire to seek out and explore any deeper levels of his thinking and cognitive functioning." Relatedly, the board observed that petitioner's "demeanor during his testimony often reflected a callous disregard for the seriousness of the crime," perhaps echoing his acknowledged focus solely on his own needs at the time he committed the murder.

The board also found that petitioner "displayed little to no ability to identify personal weaknesses, or areas where improvement is needed." In particular, although petitioner is articulate and gave lengthy answers to many questions, the board found him "unable to express how he is different now from the man who thought he could 'get away with it,' and who believed that if he wanted something, 'why not take it?'" Thus, the board stated, petitioner's self-analysis during the murder review hearing still "centered on his needs and was expressed in generalities such as, 'I can't * * * go through this again.'"

> "In sum, the Board has cause to doubt that [petitioner] has fully examined the motives for his actions and the depth of his culpability, and remains unconvinced that [petitioner] is presently demonstrating the maturity, stability, self-knowledge, and responsibility, that may promote conformity to law and establish that he is capable of rehabilitation within a reasonable period of time."

Finally, the board took into account a 1981 psychological evaluation, as well as petitioner's testimony in the current murder review hearing, in concluding that he continued to suffer an emotional disturbance that made him a danger to the community:

"A psychological evaluation, completed in 1981 by Dr. F. Robert Stuckey as part of the presentence investigation, states that it is advisable to evaluate [petitioner] 'on his past performance and behaviors rather than totally accepting his verbalizations.' Dr. Stuckey also said [petitioner] is a person 'who could behave in a way that would cause different people to form different impressions of him.' Dr. Stuckey concluded at that time that [petitioner] fit the diagnosis of borderline personality, and that the prognosis for crime-free behavior was poor. Although [petitioner] has not submitted a current psychological evaluation, based upon his presentation to the Board, as well as the historical information which is in the record, the Board finds there is evidence that [petitioner] suffers from a present severe emotional disturbance such as to constitute a danger to the health or safety of the community. OAR 255-032-0011(8)(h)."

The board therefore concluded, as it had after the previous hearings, that petitioner had not met his burden of proving the likelihood of rehabilitation. The board also confirmed its earlier decision not to provide petitioner with a new psychological evaluation:

"[Petitioner's counsel] objected to the Board's denial of [petitioner's] motion requesting that the Board order a psychological evaluation to assist [petitioner] in demonstrating 'that his mental state has improved.' [Petitioner's counsel] argued that a current psychological examination is necessary to counter a 1997 psychological examination that is in the Board's file, and that failure to order one violates due process requirements * * * as well as the [Administrative Procedures Act]. The board declines to revisit the decision not to order an evaluation * * *. As stated [in an earlier order], [petitioner] has the burden of proof, and no contested case procedures require that an agency create evidence."

Petitioner sought administrative review, and the board issued an administrative review response affirming its determination that petitioner had not proved that he was capable of rehabilitation within a reasonable period of time. "Simply put," the board explained, it "did not find that evidence of rehabilitation outweighs the evidence that [petitioner] lack[s] the maturity, stability, responsibility, and personality development required for a finding of rehabilitation

within a reasonable period of time." Petitioner seeks judicial review of that order.

On review, petitioner argues, as he did to the board, that he has a due process right to a current psychological evaluation, to be conducted at the board's expense. Petitioner argues, first, that the board's decision deprived him of a liberty interest in his eventual release on parole, for which he can become eligible only after he proves that he is likely to be rehabilitated within a reasonable period of time. Next, applying the balancing test set out in *Mathews v. Eldridge*, 424 US 319, 96 S Ct 893, 47 L Ed 2d 18 (1976), petitioner argues that the procedures associated with his murder review hearing did not satisfy due process requirements.[4] In particular, petitioner contends that he was constitutionally entitled to a current psychological evaluation, supplied by the board, because the lack of such an evaluation deprived him of "a significant opportunity to meet and to make a record concerning critical elements of his burden of proof" to establish that he is likely to be rehabilitated and, therefore, should become eligible for parole:

> "Without a *current* psychological evaluation, the risk of an erroneous determination that a prisoner is *not* likely to be rehabilitated within a reasonable period of time is great, because the board has effectively denied the indigent inmate a meaningful opportunity to prove critical components of that determination and to make an evidentiary record."

(Emphasis in petitioner's brief.) Asserting that he has a significant interest in becoming eligible for parole and that the board's interest in avoiding the expense of a psychological evaluation is minimal, petitioner concludes that a balancing

---

[4] The Court explained in *Mathews* how courts should determine what process is due to people who may be affected by certain governmental proceedings:

"[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

424 US at 335.

of the *Mathews* factors establishes that "the board's procedures must provide for an appointed psychological evaluation when requested by an indigent inmate."

Petitioner's application of the *Mathews* factors to the circumstances of this case is well-reasoned. However, petitioner's argument does not address controlling post-*Mathews* precedent that resolves the case against him— even assuming, as we do for purposes of this opinion, that petitioner has a protected liberty interest in becoming eligible for release on parole pursuant to ORS 163.105(3) (1979). *See Stogsdill v. Board of Parole*, 342 Or 332, 335-36, 154 P3d 91 (2007) (an inmate has a protected liberty interest under ORS 144.120 and ORS 144.245, which entitle an inmate to be released on parole "unless the board is persuaded that he has a present severe emotional disturbance that constitutes a danger to the health or safety of the community"); *Miller v. Oregon Board of Parole*, 642 F3d 711, 716 (9th Cir 2011) (ORS 163.105 (1981) gives rise to a liberty interest).

That controlling precedent starts with *Greenholtz v. Inmates of Neb. Penal and Correctional Complex*, 442 US 1, 3-4, 99 S Ct 2100, 60 L Ed 2d 668 (1979), in which inmates challenged the procedures by which the Nebraska Board of Parole determined their eligibility for release on parole. That determination was guided by a statute that required the parole board to release an inmate unless it determined that release should be deferred for one of four statutorily specified reasons, including that there was "'a substantial risk that [the inmate would] not conform to the conditions of parole'" or that the inmate's "'continued correctional treatment, medical care, or vocational or other training in the facility [would] substantially enhance his capacity to lead a law-abiding life when released at a later date.'" *Id.* at 11 (quoting Nebraska statute). In addition, the statute set out factors that the parole board was "required to take into account in deciding whether or not to grant parole," including such things as the inmate's "personality, including his maturity, stability, sense of responsibility and any apparent development in his personality which may promote or hinder his conformity to law," and the inmate's "mental or physical makeup, including any disability or handicap which may affect his conformity to law." *Id.* at 16-17.

The inmates argued that the Due Process Clause entitled them to certain protections during parole-release proceedings, and the Eighth Circuit Court of Appeals agreed, requiring the board to give each parole-eligible inmate "a full formal hearing" at which the inmate could appear in person and present documentary evidence in his own behalf. *Id.* at 6. That court also required the parole board, within a reasonable time after hearing, to "submit a full explanation, in writing, of the facts relied upon and reasons for the Board's action denying parole." *Id.*

The Supreme Court reversed, rejecting the idea that the inmates had a due process right to such procedures. Noting the discretionary nature of the parole board's decision, even as guided by the pertinent statutes, the Court held that the Due Process Clause does not require "repeated, adversary hearings in order to continue the confinement" of a person who already has been convicted. *Id.* at 13-14. Accordingly, the Court rejected the Court of Appeals' holding that due process required the parole board to give each inmate a full hearing and, when denying parole, a statement of the evidence that the board had relied upon. *Id.* at 14-15. Rather, the Court held, due process requirements were satisfied by Nebraska's existing parole procedures, which allowed each inmate "to appear before the Board and present letters and statements on his own behalf," supplementing the board's own records, and which told each inmate "in what respects he [fell] short of qualifying for parole." *Id.* at 15-16. "The Constitution," the Court held, "does not require more." *Id.* at 16.

The Court stated the principle even more bluntly in *Swarthout v. Cooke*, 562 US 216, 131 S Ct 859, 178 L Ed 2d 732 (2011). In that case, the Court addressed what procedures are constitutionally required in association with a California statute that requires its parole board to "'set a release date unless it determines that * * * consideration of the public safety requires a more lengthy period of incarceration.'" 562 US at 216-17 (quoting California statute). In reviewing decisions made under that statute, the California Supreme Court had explained, state appellate courts would consider "whether 'some evidence' supports the conclusion that the inmate is unsuitable for parole because he or she

currently is dangerous." *Id.* at 217 (quoting *In re Lawrence*, 44 Cal 4th 1181, 1191 (2008)). In federal habeas corpus proceedings, the Ninth Circuit Court of Appeals held that a decision denying an inmate release on parole "was an unreasonable application of California's 'some evidence' rule and was an unreasonable determination of the facts in light of the evidence presented." *Id.* at 219 (quoting *Clay v. Kane*, 384 Fed Appx 544, 546 (9th Cir 2007) (unpublished)).

Again, the Supreme Court reversed, this time in a per curiam decision. To the extent that the Ninth Circuit may have concluded that the Due Process Clause required "correct application of the State's 'some evidence' standard," the Court held, it was mistaken. *Id.* at 219-20. Citing *Greenholtz*, the Court reiterated that statutes governing inmates' release on parole ensure that inmates receive "adequate process" through "an opportunity to be heard" and "a statement of the reasons why parole was denied." *Id.* at 220. The Court observed that the California inmates had

> "received at least this amount of process: They were allowed to speak at their parole hearings and to contest the evidence against them, were afforded access to their records in advance, and were notified as to the reasons why parole was denied."

*Id.* "That," the Court held, "should have been the beginning and the end of the federal habeas courts' inquiry into whether [the inmates] received due process." *Id.* The Court emphasized that, when the liberty interest at issue is the interest in receiving parole when state standards for parole have been met, "the minimum procedures adequate for due-process protection of that interest are those set forth in *Greenholtz*." *Id.* at 221.

Holdings of the Oregon Supreme Court are consistent with those principles. In *Stogsdill*, the court addressed the protections that are due an inmate who seeks parole pursuant to ORS 144.120 and ORS 144.125(3), which require the board to set initial parole release dates for most inmates and to postpone such a release date only upon finding that the inmate has a "'present severe emotional disturbance such as to constitute a danger to the health or safety of the community.'" 342 Or at 335-36 (quoting ORS 144.125(3)).

In *Stogsdill*, the board postponed the petitioner's release date after it found, by a preponderance of the evidence, that he had such a condition. *Id.* at 334. The petitioner sought review, arguing that the Due Process Clause required the board to apply a higher standard of proof. In rejecting that argument, the Supreme Court held that, although an inmate has a liberty interest in obtaining parole under those statutes, "the significance of [that] interest is diminished by the existence of a conviction that permits the state to hold him for the duration of his sentence[.]" *Id.* at 337, 342.

Although petitioner cites *Cooke* and *Stogsdill*, he does not acknowledge the holdings in those cases or in *Greenholtz*; nor does he explain why Oregon's murder review proceedings differ so fundamentally from the statutory proceedings at issue in those cases that a different due process analysis should apply. And the arguments that petitioner does make do not persuade us that *Greenholtz, Cooke,* and *Stogsdill* are materially distinguishable. In arguing that he had a due process right to a board-funded psychological evaluation, petitioner emphasizes that he had the burden of proving that he was likely to be rehabilitated within a reasonable time and contends that, absent a current psychological evaluation, he had no meaningful way to make that showing. Petitioner points to OAR 255-032-0020, which directs the board to consider factors to which a psychological evaluation could be relevant, like the inmate's "maturity, stability, demonstrated responsibility, and any apparent development in the inmate personality which may promote or hinder conformity to law" and whether the inmate has "a mental or emotional disturbance, deficiency, condition or disorder predisposing them to the commission of a crime to a degree rendering them a danger to the health and safety of the community." OAR 255-032-0020(4), (8).

The difficulty for petitioner is two-fold. First, to the extent that due process considerations may be affected by the legislature's allocation of the burden of proof to the inmate, the result does not benefit petitioner. If anything, an inmate's liberty interest in parole is further diminished when the statutory scheme creates a presumption against parole, rather than for it. *Cf. Board of Pardons v. Allen*, 482

US 369, 374, 107 S Ct 2415, 96 L Ed 2d 303 (1987) (explaining that, in deciding in *Greenholtz* that a Nebraska statute created a protected liberty interest, the Court "found significant its mandatory language—the use of the word 'shall'—and the presumption created—that parole release must be granted unless one of four designated justifications for deferral is found").

Second, the balancing that petitioner asks us to conduct already has been conducted by the United States Supreme Court, which has held that the Due Process Clause guarantees inmates seeking parole nothing more than a right "to speak at their parole hearings and to contest the evidence against them, [to have] access to their records in advance, and [to be] notified as to the reasons why parole was denied." *Cooke*, 562 US at 220. That is true even when, as in *Greenholtz*, a parole board is required to consider such matters as the inmate's mental state, maturity, stability, sense of responsibility, and ability to conform behavior to the law—*i.e.*, factors similar to those that the parole board considered here. 442 US at 16-17. It follows that the *Greenholtz* rule applies in this context, notwithstanding petitioner's focus on the fact that the board necessarily considered his mental state in determining whether he had met his burden of proving that he was likely to be rehabilitated within a reasonable time.

In the end, what matters for the *Greenholtz/Cooke* analysis is the process that petitioner received in conjunction with his murder review hearing, *not* what additional procedures might have benefited either him or the board in making its determination. We turn to that question. Petitioner received notice of his 2010 murder review hearing, prehearing access to his records, the right to present evidence in his favor and to make a statement to the board, and a complete explanation of why the board declined to declare him eligible for parole under ORS 163.105(3) (1979). Those procedures satisfied the requirements of the Due Process Clause. *See Miller*, 642 F3d at 717 (an Oregon inmate was afforded all process that was due in conjunction with his murder review hearings when he "was afforded access to his records in advance of the hearings, * * * he was given the opportunity to submit information to the Board and to make a statement

during the hearing" and he was "eventually provided with a written statement of the reasons why he was denied early eligibility for parole"); *see also Smith v. Board of Parole*, 268 Or App 457, 469, 343 P3d 245 (2015) (under *Cooke*, "the ability to subpoena witnesses is not a requirement for a constitutionally adequate parole consideration hearing under ORS 144.228").

Affirmed.